UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADAM SANDLER, M.D.

                Plaintiff,

       -v-

MONTEFIORE HEALTH SYSTEM,
INC., et al.,

              Defendants.

16-CV-2258 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Adam Sandler brings this action against Defendants Montefiore Health System, Inc., Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc., Albert Einstein College of Medicine, Inc., and Dr. Reza Yassari, alleging discrimination and retaliation in violation of 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* Plaintiff also asserts claims against Yassari for aiding and abetting discrimination and retaliation, and against Montefiore for breach of contract and breach of the implied covenant of good faith and fair dealing.

Defendants move (1) for summary judgment and (2) to strike Plaintiff's expert report. For the reasons that follow, both motions are granted in part and denied in part.

I.      **Background**

The following facts are drawn primarily from the parties' Rule 56.1 statements and are not subject to genuine dispute unless otherwise noted.

Defendant Montefiore Health System, Inc., is a network of hospitals and other medical care and educational facilities; it is the parent company of the other corporate defendants. (Dkt.

No. 82 ("SUF") ¶ 1.)  Defendant Montefiore Medical Center ("MMC") is an academic medical center and hospital.  (SUF ¶ 2.)  The Albert Einstein College of Medicine is a research-intensive medical school, which sponsored residency training programs at MMC until February 2015. (SUF ¶¶ 3–4.)  In February 2015, MMC became the sole sponsoring institution for all residency training programs at MMC.  (SUF ¶ 4.)

Defendant Reza Yassari is an attending physician,[1] associate professor, and program director of the neurological surgery residency program at MMC.  (SUF ¶ 7.)  Yassari was a resident in the University of Chicago's neurosurgical residency program from 2003 to 2009, prior to joining MMC's faculty in 2010.  (SUF ¶¶ 303–304.)

Plaintiff Adam Sandler was a resident in MMC's neurosurgical residency program from 2010 to 2016; Sandler transferred to MMC at the start of his second residency year (postgraduate year two or "PGY-2") in July 2010.[2]  (SUF ¶ 9.)  Sandler identifies as an Orthodox Jew (SUF ¶ 10), and he was the only Orthodox Jewish resident during his residency.  (Dkt. No. 78 ("Pl. Decl.") ¶ 8.)

MMC's neurosurgical residency is a seven-year program designed to train medical residents to become neurosurgeons.  (SUF ¶ 12.)  At the beginning of each residency year, the residents sign a contract with MMC called a "House Officer Agreement," which governs their employment relationship.  (SUF ¶ 26.)  The neurosurgical residency program at MMC is

---

[1]    An "attending physician" is a physician who has completed a residency in a certain specialty and is responsible for supervising residents, fellows, and medical students. (SUF at 3 n.2.)

[2]    Residency years all begin on July 1 and end on June 30 of the following year. (SUF ¶ 14.)

accredited by the Accreditation Council for Graduate Medical Education ("ACGME").  (SUF ¶ 13.)

During the program, residents progress from internship during their first year (PGY-1) to junior residency (PGY-2 and PGY-3) to senior residency (PGY-4 and PGY-5).  (SUF ¶¶ 15–16, 18.)  PGY-6 is generally a "research year," during which residents either work on independent research projects or participate in an "enfolded fellowship," which focuses on developing surgical skills in a neurosurgical subspecialty (e.g., neuro-oncology).  (SUF ¶ 20.)  Finally, PGY-7 is the chief residency year.  (SUF ¶ 21.)

Sandler's relationship with his program director, Dr. Yassari, is at the core of this dispute. Sandler avers that he began working with Yassari more frequently in his PGY-5 year and that Yassari "routinely bullied and disparaged" him and made several anti-Semitic comments to him. (Pl. Decl. ¶¶ 34–38.)  Yassari denies making anti-Semitic comments and maintains that if he ever "lost [his] cool and shouted or cursed" it was in response to a "careless or inexcusable error" that Sandler committed during surgery.  (Dkt. No. 59 ("Yassari Decl.") ¶¶ 124, 129.)  In July 2015, Sandler complained about Yassari's allegedly anti-Semitic treatment to the former chief of MMC's Division of Spinal Neurosurgery, Dr. John Houten, who identifies as Orthodox Jewish. (SUF ¶ 100; Dkt. No. 79 ¶¶ 2–3.)  Sandler also complained about the alleged anti-Semitism to Yassari directly during PGY-5.  (Dkt. No. 77-1 at 21:19–22:4.)

During his residency, Sandler received annual written performance evaluations from faculty and had several discussions about his performance with Dr. Eugene Flamm, Chairman of the Department of Neurological Surgery.  (SUF ¶¶ 5, 38.)  Around the end of PGY-5 or beginning of PGY-6, Drs. Flamm and Yassari reviewed Sandler's case logs with him and highlighted certain categories in which he had not satisfied the number of cases required to

graduate from the program. (SUF ¶¶ 64–65.) Sandler testified that this was the first time

Yassari and Flamm notified him of a deficit in his case numbers. (SUF ¶ 65.) In March 2015,

Flamm and Yassari met with Sandler to discuss his semi-annual evaluation for PGY-6 and again

reviewed his case logs with him. (SUF ¶ 78.) They advised Sandler that, during PGY-7, he

would need to focus on the categories where his case numbers were low to ensure that he could

graduate on time. (SUF ¶ 79) At the start of his chief residency (PGY-7), Yassari reviewed

Sandler's case index to determine if he was on track to graduate in June 2016: Sandler testified

that Yassari emailed him to notify him that he was two standard deviations below the national

average case volume for residents entering PGY-7. (SUF ¶ 78; Dkt. No. 77-6 at 278:16–280:14;

Yassari Decl. ¶ 59.)

     During PGY-7, Sandler participated in several surgeries during which a surgical error

exposed the patient to some risk of adverse outcome (though the parties dispute the seriousness

of these incidents):

- In June 2015, Sandler assisted Dr. David Altschul with a cranial surgery, during
  which the patient experienced an "intraoperative aneurysm rupture," causing
  significant bleeding in the surgical field. (SUF ¶ 94.) Altschul avers that Sandler
  should have known to ask for a "larger suction" to clear the surgical field and help
  locate the source of the bleed, but instead he froze and failed to take any action.
  (Dkt. No. 65 ¶ 8; Dkt. No. 65-1 at 1.) Sandler disputes Altschul's account of
  these events. (SUF ¶¶ 95–96.)

- In July 2015, during a spinal surgery with Dr. Yassari, Sandler inadvertently
  poked the patient's exposed spinal cord with a surgical instrument, temporarily
  paralyzing the patient's leg. (SUF ¶¶ 98–99; Pl. Decl. ¶ 128.) Yassari responded
  by saying to Sandler, "[Y]ou fucking suck," and throwing him out of the
  operating room. (SUF ¶¶ 98–99.)

- In August 2015, Sandler assisted Dr. David Gordon with an operation to insert a
  ventriculoperitoneal shunt to treat excess fluid in a patient's brain. (SUF ¶ 104.)
  Dr. Gordon stepped out of the operating room, and Sandler continued the
  procedure. While Dr. Gordon was out of the room, Sandler unintentionally
  perforated the patient's skin (an error that Sandler maintains is common during
  shunt procedures). (Pl. Decl. ¶ 131.) Sandler attempted to correct his mistake by

making an incision in the patient's skin; Dr. Gordon opined that Sandler "exhibited flawed clinical judgment" by attempting to correct the perforation himself without first contacting Dr. Gordon. (SUF ¶ 109.) On August 4, 2015, Yassari met with Sandler to discuss the mistakes during this surgery and the July 2015 spinal surgery with Yassari. (SUF ¶ 110.)

- On September 25, 2015, Sandler assisted Dr. Altschul in two procedures involving acute subdural hematomas. (SUF ¶ 138.) Dr. Altschul avers that in both cases, Sandler could not locate the source of the bleeds, which he should have been able to do by PGY-5. Sandler disputes Altschul's account. (SUF ¶ 139.)

- In October 2015, Sandler assisted Dr. Merritt Kinon in treating a patient with a non-emergency subdural hematoma. (SUF ¶ 140.) The patient was on anticoagulation medication, which increased the risk that the patient would hemorrhage during surgery. Dr. Kinon avers that Sandler inappropriately advocated for emergency surgery, which would have created an unnecessary risk to the patient. (Dkt. No. 66 ¶ 9.) According to Kinon, when he explained these risks, Sandler became confrontational and argumentative. Sandler disputes this account. (SUF ¶¶ 140–144.)

- On October 6, 2015, Sandler participated in a lumbar spine surgery with Dr. Yassari. Sandler was tasked with performing the spinal exposure, which required opening the skin and muscle tissue to create a clear surgical field of vision to allow placement of surgical screws in the lumbar spine area. Yassari opined that Sandler failed to create an adequate exposure to safely place the surgical screws; Sandler maintains that he was not solely accountable for any purported errors because two junior residents performed most of the exposure. (SUF ¶¶ 149–153.) While Sandler attempted to adjust the exposure and place the screws, Yassari cursed at him and eventually demanded that he leave the operating room. (SUF ¶ 153.)

As Chief Resident, Sandler also had certain administrative responsibilities, including supervising resident rounds in the intensive care unit. (SUF ¶¶ 92, 129.) After observing rounds in September of Sandler's chief residency year, Yassari characterized them as chaotic. (Yassari Decl. ¶ 70.) Yassari attributed the problems to poor leadership and instruction from Sandler, who had failed to create organizational systems for assigning tasks to junior residents, reviewing medical records, or communicating with ICU staff. (Yassari Decl. ¶ 71.) Sandler disputes that

rounds were "chaotic" (SUF ¶ 127), and maintains that he followed the same systems that had been in place throughout his residency (SUF ¶ 131).

On October 9, 2015, Sandler had a performance review with Dr. Flamm, who informed Sandler that his surgical skills and leadership were unsatisfactory for a chief resident. (SUF ¶¶ 162–163.) Later that month, Sandler met with Dr. Catherine Skae, MMC's Vice President of Graduate Medical Education. (SUF ¶ 170.) During that meeting, he complained about the quality of training he received during the residency program and about Yassari's abusive treatment. (SUF ¶ 171.) Sandler neither complained of anti-Semitism specifically nor alleged a discriminatory motive behind Yassari's abusive treatment. (Dkt. No. 68 ¶ 49.) On October 27, 2015, Skae met with Flamm, Yassari, and an associate general counsel from the legal department to discuss Sandler's complaints. (SUF ¶ 177.) Three days later, Skae and Sandler met again, and at this meeting, Sandler complained specifically that Yassari had made two "anti-Jewish comments." (SUF ¶ 184.)

Two more purported surgical mishaps occurred in November 2015:

- On November 4, 2015, Sandler assisted Dr. Ira Abbott with a procedure on a critically ill infant. According to Abbott, Sandler "became completely lost while attempting to setup [*sic*] the surgical guidance equipment, a skill which he should have learned in his PGY-2 or PGY-3 year. (Dkt. No. 62 ¶ 32.) Following the surgery, Abbott asked Sandler to close three small skin incisions made during the procedure. Abbott then left the operating room and reminded Sandler of the importance of quickly closing the incisions. (Dkt. No. 62 ¶¶ 34–35.) Abbott avers that, upon his return fifteen minutes later, he observed Sandler "leisurely" closing the first incision with "no sense of urgency." (Dkt. No. 62 ¶ 36.) Sandler contests the accuracy of Abbott's account. (SUF ¶¶ 187–193.)

- On the evening of November 4, Sandler called Dr. Gordon at home concerning a patient who needed emergency surgery to treat a life-threatening brain injury. (SUF ¶ 194.) According to Sandler, Yassari was the attending on call, but he failed to answer multiple calls from Sandler. Dr. Gordon instructed Sandler to move the patient to the operating room quickly and begin the surgery to save the patient's life. But when Dr. Gordon arrived thirty minutes later, neither Sandler nor the patient was yet in the operating room. Gordon cursed at Sandler and

yelled at him to move the patient to the operating room immediately. The patient was brought to the operating room, and Gordon and Sandler began the surgery. (SUF ¶¶ 194–200.) Gordon avers that, during the surgery, Sandler made several errors, which led to delay and jeopardized the patient's safety. Sandler failed to acknowledge these errors. (Dkt. No. 64 ¶¶ 42–54.) Sandler disputes Gordon's account of the surgery and its aftermath. (SUF ¶¶ 201–204.)

On November 11, Sandler met again with Flamm to discuss Sandler's performance. Without alleging anti-Semitism, Sandler complained about Yassari's verbal abuse during this meeting, and Flamm was not receptive to those complaints. (SUF ¶¶ 205–208.) Five days later, the neurosurgery faculty met at Flamm's request to discuss Sandler's performance. (SUF ¶ 210.) The faculty agreed that Abbott should speak with Sandler about the possibility of remediation and other options to address his deficiencies in performance. (SUF ¶ 214.) Abbott informed Sandler on November 19, 2015, of the faculty's opinion that Sandler would not graduate in June 2016. (SUF ¶ 218.) The two discussed Sandler's potential options, including the possibility of remediation or of choosing a new residency program. (SUF ¶¶ 218–219.) On December 1, Skae and MMC's labor and employment counsel met separately with Flamm, Yassari, Abbott, and Gordon to investigate Sandler's allegations of abusive conduct. (SUF ¶ 252.)

After several individual meetings with Abbott and Skae, the three met together on December 9, 2015. At this meeting, Sandler informed Abbott and Skae that he had decided to pursue a residency in rehabilitation medicine, with the goal of becoming a neuro-rehabilitation specialist. (SUF ¶ 230.) On December 15, Flamm relieved Sandler of his clinical duties at MMC. (SUF ¶ 233.) On December 24, Sandler's counsel mailed a letter to MMC's general counsel informing MMC of their intention to pursue legal action against it. (Dkt. No. 77-132.)

That month, Yassari and Skae began working to create a six-month rehabilitation rotation for Sandler at a hospital affiliated with Montefiore. (SUF ¶ 235.) On January 4, 2016, Abbott and Yassari informed Sandler that he was accepted for a rehabilitation rotation. (SUF ¶ 238.)

Skae then informed Dr. Philip Ozuah, the Executive Vice President and Chief Operating Officer of MMC, that Sandler would be pursuing a rehabilitation rotation at an affiliated hospital. (SUF ¶ 240.) Ozuah instructed Skae to speak with MMC's general counsel to get a release agreement before permitting Sandler to start his rehabilitation rotation. (SUF ¶ 242.) According to Ozuah, it was standard practice to require a release agreement anytime MMC made a "compassionate or generous" offer to a resident who was going to be discharged. (SUF ¶ 244.) Sandler's counsel and MMC's labor and employment counsel engaged in settlement discussions concerning Sandler's claims against MMC and his potential rotation, but by March 2016, those discussions failed. (SUF ¶¶ 246–247.) Flamm drafted a letter informing Sandler that he would be terminated from the program effective April 12. (SUF ¶ 248.)

In August 2016, ACGME notified Skae and Yassari that Sandler had filed a complaint alleging that the program violated ACGME's requirements in the following ways: (1) MMC failed to provide him with due process with respect to his dismissal; (2) residents were not provided with timely semiannual evaluations; (3) MMC fostered a climate of fear, intimidation, and retaliation; (4) disciplinary action was disproportionate and did not involve any meaningful sanction; and (5) surgical volumes available to residents were inadequate. (SUF ¶ 261–262.) A few months later, ACGME conducted a full-day, onsite evaluation of the residency program. (SUF ¶ 264.) In January 2017, ACGME notified MCC that the program's accreditation would continue, and that "[n]o further action [was] required" on Sandler's complaint. (SUF ¶ 265.) ACGME's final report arrived a month later, confirming that the program's accreditation would be continued and dismissing Sandler's complaint. (SUF ¶ 267.)

Following his dismissal, MMC needed to determine how much credit Sandler would receive for his time in the residency program. (SUF ¶ 271; Dkt. No. 77-141 at 2.) At the

direction of defense counsel, Yassari began conducting a review of Sandler's case logs to determine whether Sandler actually performed or assisted the surgeries and procedures he logged. (Dkt. No. 33 ¶ 4; Dkt. No. 32 ¶ 4.) MMC maintains that Yassari's review was initiated at Dr. Flamm's request, with the goal of determining how many credits Sandler had earned during PGY-7. (SUF ¶ 272.) On July 28, 2016, Yassari wrote to the American Board of Neurological Surgery to explain that MMC had discovered inconsistencies in Sandler's case logs and would be withholding credit pending further investigation. (SUF ¶ 273.)

Yassari proceeded to analyze each case that Sandler logged between June 12 and September 10, 2015, to confirm whether Sandler actually performed the procedure. (SUF ¶ 274.) At the close of his analysis, Yassari concluded that Sandler had falsely reported participation in twelve procedures which either never took place or which occurred simultaneously in different places. (SUF ¶ 276; Dkt. No. 77-146.) Sandler maintains that he neither falsified case logs nor intentionally logged cases that he did not perform. (Pl. Decl. ¶ 146.) Based on the results of this investigation, MMC determined that it had an obligation under New York state law to report Sandler to the Office of Professional Medical Conduct ("OPMC") in New York State's Department of Health. (SUF ¶ 277.) On January 19, 2017, Dr. Flamm reported Sandler to OPMC for submitting falsified training records. (SUF ¶ 278.)

Sandler had filed this lawsuit on March 28, 2016, approximately ten months before MMC reported him to OPMC. (Dkt. No. 1.) Defendant now moves (1) for summary judgment and (2) to strike Plaintiff's expert report.

## II.    Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250–51). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

Sandler's first set of claims alleges that Defendants violated federal, state, and municipal law by discriminating against him on the basis of his Orthodox Jewish identity. Sandler's second set of claims alleges retaliation. Finally, Sandler also asserts a third set of contractual claims. The Court addresses each category of claims in turn.

### A. Discrimination Claims

Sandler's discrimination causes of action break down into two subcategories: (1) disparate treatment and (2) hostile work environment.

#### 1. Disparate Treatment

Sandler claims his termination from the residency program was unlawfully discriminatory. (Dkt. No. 83 at 10.) His disparate treatment claims arise under 42 U.S.C.

§ 1981,[3] the NYSHRL, and the NYCHRL.  "The burden[s] of proof and production for

employment discrimination claims under Title VII, § 1981 . . . and the NYSHRL are identical,"

*Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 210 n.19 (E.D.N.Y. 2014): they are all subject

to the familiar *McDonnell Douglas* burden-shifting standard.  *See McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973).

"Under this framework, a plaintiff must first establish a *prima facie* case of

discrimination," *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010), which consists of

the following elements:

> (i) she was a member of "a protected class"; (ii) she was qualified
> "for the job benefit at issue"; (iii) "she was subjected to adverse
> employment actions"; and (iv) "these actions were taken under
> circumstances giving rise to an inference of discrimination."

*Crawley v. Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228, 2016 WL 6993777, at *7 (S.D.N.Y.

Nov. 29, 2016) (quoting *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001)).  If the plaintiff

satisfies her *prima facie* burden of production, then "the burden shifts to the defendant to

articulate 'some legitimate, non-discriminatory reason' for its action."  *Holcomb v. Iona Coll.*,

521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802).  "If the

employer does so, the burden then shifts back to the plaintiff to show that the employer's

explanation is a pretext for race discrimination."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223,

225 (2d Cir. 2014).  At that point, "the [employee's] admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the

[employer's] employment decision was more likely than not based in whole or in part on

---

[3]    Individuals of Jewish ancestry are members of a protected class under § 1981.
*See Capek v. BNY Mellon, N.A.*, No. 15 Civ. 4155, 2016 WL 2993211, at *3 n.3 (S.D.N.Y. May
23, 2016).

discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)) (alterations in original).

Sandler's NYCHRL claim must be construed "independently from and more liberally than" his federal claim. *Ben–Levy v. Bloomberg L.P.*, 518 F. App'x 17, 19–20 (2d Cir. 2013) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)). The NYCHRL analysis, which is guided by the Second Circuit's decision in *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013), "mirrors the *McDonnell Douglas* framework, but accords Plaintiff a lesser burden of showing only that Defendants' actions were based, in part, on discrimination." *Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15 Civ. 9965, 2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017). The plaintiff must introduce sufficient evidence to show that her employer treated her "less well," and did so "at least in part for a discriminatory reason." *Id.* at *9 (quoting *Mihalik*, 715 F.3d at 110 n.8). "The burden then shifts to Defendants to present 'legitimate non-discriminatory motives to show the conduct was not caused by discrimination, but [they are] entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination played *no* role' in its actions.'" *Id.* at *12 (emphasis in original) (quoting *Mihalik*, 715 F.3d at 110 n.8).

Defendants "[a]ssum[e] without conceding" that Sandler has established a *prima facie* case, but they do not offer any argument that Sandler has failed to meet his *prima facie* burden. (Dkt. No. 70 at 5.) Instead, they contend that summary judgment is warranted because they "articulated legitimate non-discriminatory reasons for the challenged actions and there is no record evidence of pretext." (*Id.*) Sandler, for his part, does not contest that Defendants have proffered legitimate nondiscriminatory reasons for terminating him (Dkt. No. 83 at 10–11), including his poor surgical skills, clinical decision-making, and administrative and

communication abilities. (Dkt. No. 70 at 7.) "Because plaintiff's burden at the *prima facie* stage is minimal, and because plaintiff does not argue [Defendants] failed to proffer a legitimate, non-discriminatory explanation for its adverse employment actions, the Court will proceed directly to the third step of the *McDonnell Douglas* analysis to determine whether plaintiff has shown [Defendants'] legitimate reason[s] for the adverse employment action [were] pretext." *Pineda v. Byrne Dairy, Inc.*, 212 F. Supp. 3d 467, 475 (S.D.N.Y. 2016) (footnotes omitted).

"To avoid summary judgment . . . , 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'" *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)). Although "[d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable, . . . [i]t is well settled that. . . plaintiffs are entitled to rely on circumstantial evidence." *Id.* (internal citation omitted). The ultimate question is whether the plaintiff has proffered sufficient evidence from which "a reasonable juror could conclude that [Defendants'] explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

The Court concludes that Sandler has satisfied his burden to survive summary judgment on his disparate treatment claims. First, and foremost, Sandler has adduced significant, though controverted, evidence that Yassari harbored anti-Semitic animus throughout Sandler's residency. For example, Sandler testified that during his PGY-7 year, Yassari told him that "nobody supports you doing this except for Dr. Houten [the only other Orthodox Jewish doctor], and that's because he has a tribal affinity for you." (Dkt. No. 77-8 at 329:10–329:14.) Sandler also avers that during PGY-6, Yassari told a hospital technician that "Sandler is Jewish;

everything will work out for him."  (Pl. Decl. ¶ 46.)  During his PGY-5 year, Yassari told

Sandler that Dr. Frim, Yassari's Jewish co-resident at the University of Chicago, was appointed

chief of the department over a more qualified attending physician because, as that physician told

Yassari, "the Jews fucked [him]."  (Dkt. No. 77-8 at 258:11–258:18.)  Sandler also testified that

Yassari told him that "the only reason Frim liked you was because you are Jewish" and then said

sarcastically "what a nice Jewish boy."  (Dkt. No. 77-7 at 225:22–226:5.)  Yassari also subjected

Sandler to a litany of insulting and derogatory, albeit facially neutral, remarks including: "you

fucking suck"; "you don't deserve be a neurosurgeon"; "the lawyers will take you out"; "you

won't support your family doing this"; "they will fire you in private practice"; "I can't wait to

get rid of you"; "You're the father of two children, pathetic"; "I want nothing to do with you";

"Just get your numbers and leave this program"; and "you are lucky I don't call the fellowship,

Dr. Qureshi and tell him not to take you."  (Dkt. No. 77-170 at 2.)

     Defendants contend that these comments are "mere stray remarks" that "do not evidence

any discriminatory animus."  (Dkt. No. 70 at 12–13.)  The Court disagrees.  "In determining

whether remarks are probative of discriminatory intent, a court properly considers '(1) who made

the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark

was made in relation to the employment decision at issue; (3) the content of the remark

(*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in

which the remark was made (*i.e.*, whether it was related to the decision-making process).'"

*Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 742 (2d Cir. 2014)

(quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)); *see also Tomassi v.

Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the

remarks are in relation to the employer's adverse action, the less they prove that the action was

motivated by discrimination."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Here, although none of the comments were made during the decision-making process (factor 4), Yassari was a decision-maker (factor 1) and at least one of the comments ("tribal affinity") was made during Sandler's PGY-7 year (factor 2.)

With respect to factor 3—whether a reasonable juror could view the remark as discriminatory—courts consider if the remark "(1) makes a reference to a Title VII-protected class *and* (2) provides some indication that membership in such a class is disapproved of." *Jalal v. Columbia Univ. in City of N.Y.*, 4 F. Supp. 2d 224, 236 (S.D.N.Y. 1998). Yassari's comments regarding Jews—especially those that attribute Sandler's success to his identity—satisfy both of these criteria. "Just as '[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school,' so it takes no special training to discern stereotyping" and disapproval in the view that a Jewish doctor's success is attributable to conspiratorial clannishness rather than to his own individual work. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 256 (1989)); *cf. id.* at 120 n.10 (noting that the Second Circuit has taken judicial notice of the "demeaning ethnic stereotype that Jews are 'cheap'") (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 378 (2d Cir. 2003)).

A jury could conclude that such animus is even more likely in light of Yassari's comments about Jews during Yassari's residency. Sandler has adduced evidence that Yassari expressed similar anti-Jewish sentiments during his own residency at the University of Chicago from 2003 to 2009. (*See* Dkt. No. 81 ¶¶ 7–12 (Yassari's co-resident averring that Yassari said "Jews bought [Frim] a chairmanship"; another Jewish doctor was allowed to do "whatever he want[ed] because he's Jewish"; "We are enslaved" by the Jewish doctors at University of

Chicago; "It's the non-Jews against the Jews"; "We who are not Jewish have to stick together"; and used the phrase "dirty Jews").)  And as mentioned above, Yassari repeated to Sandler the view of another Chicago doctor that "the Jews fucked [that doctor]."  Standing alone, these statements are too remote to indicate that animus motivated Yassari during Sandler's PGY-7.  But when considered in context of his more recent comments, a reasonable juror could conclude that Yassari harbored longstanding animus and resentment against Jewish colleagues based on their identity.[4]  "These are not the kind of 'innocuous words' that we have previously held to be insufficient, as a matter of law, to provide evidence of discriminatory intent."  *Back*, 365 F.3d at 120.

   As this Court has explained, when there is evidence from which a reasonable jury could infer that a racially biased individual "played a meaningful role in the decision to terminate plaintiff," it is sufficient to raise a genuine issue of material fact as to the employer's motivation in terminating the plaintiff.  *See Pineda*, 212 F. Supp. 3d at 477.  Here, Sandler has adduced some evidence that Yassari, a member of the committee that decided to terminate Sandler's

---

[4]      Sandler has also adduced some evidence that he may have been treated more harshly than similarly situated residents who committed surgical errors or deficiencies in performance.  (*See* Dkt. No. 83 at 18–20; *see also* Dkt. No. 77-30 (nurse Rachel George testifying that Yassari treated Sandler more harshly than other residents)).  Defendants contend that Sandler is not similarly situated to other residents, including his co-chief resident, Dr. Biswas.  (Dkt. No. 90 at 7–9.)

   A "plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  The key factors are "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.  In other words, there should be an 'objectively identifiable basis for comparability.'"  *Id.* at 40 (internal citation omitted).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury."  *Id.* at 39.  Here, there are genuine factual disputes as to whether the other residents whom MMC disciplined were similarly situated to Sandler for purposes of comparison.  If so, such evidence could further support an inference of pretext.

residency, "had expressed bias against plaintiff based on his [Jewish identity]." *Id.* at 476. As explained in *Pineda*, even a single comment by a decision-maker indicating racial bias or alluding to negative racial stereotypes can be sufficient to raise a genuine dispute as to the employer's motivation for firing an employee. *See id.* at 470, 477 (holding that decision-maker's comment to the effect of "[y]ou guys need service on cutting grass?" to Hispanic drivers was sufficient to preclude summary judgment on question of motivation). Similarly, Yassari's comments about Jewish clannishness (e.g., "tribal affinity") could reasonably be interpreted to demonstrate anti-Jewish bias. Therefore, summary judgment is not appropriate on Sandler's federal, state, or municipal disparate treatment claims.[5]

### 2. Hostile Work Environment

Sandler also claims that he was subjected to a hostile work environment in violation of federal, state, and municipal antidiscrimination laws. (Dkt. No. 83 at 6–10.).

To prove a claim of hostile work environment under Section 1981 or the NYSHRL, a plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). "Proving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Alfano*, 294 F.3d at 374)).

---

[5]     Because Sandler has satisfied his summary judgment burden under the federal and state standards, he has also satisfied the municipal standard *a fortiori*.

"A plaintiff's burden under the NYCHRL is somewhat lower: he or she need only put forward evidence of 'unequal treatment based upon membership in a protected class.'" *Nieblas-Love v. N.Y. City Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (quoting *Fattoruso v. Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 579 (S.D.N.Y. 2012)).  In contrast to state and federal law, "the NYCHRL imposes liability for harassing conduct even if that conduct 'does not qualify as severe or pervasive, and questions of severity and pervasiveness' go only to the question of damages, not liability." *Rogers v. Bank of N.Y. Mellon*, No. 09 Civ. 8551, 2016 WL 4362204, at *12 (S.D.N.Y. Aug. 15, 2016) (quoting *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011).  Nonetheless, Defendants "can still avoid liability [under NYCHRL] if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at *13 (quoting *Mihalik*, 715 F.3d at 111).

Under federal and state law, Sandler has failed to adduce evidence of an objectively hostile environment.  In other words, his treatment was neither severe nor pervasive enough to "alter the conditions of the victim's employment and create an abusive working environment." *Dash v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 238 F. Supp. 3d 375, 385 (E.D.N.Y. 2017) (quoting *Dillon v. Ned Mgmt.*, 85 F. Supp. 3d 639, 655 (E.D.N.Y. 2015)).  "The factors considered in determining whether a work environment is objectively hostile include: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" *Wells-Williams v. Kingsboro Psychiatric Ctr.*, No. 03 Civ. 134, 2007 WL 1011545, at *4 (E.D.N.Y. Mar. 30, 2007) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "As a general rule, incidents must be more than 'episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at

374 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997)).  "However, a single

act can create a hostile work environment if it in fact 'work[s] a transformation of the plaintiff's

workplace.'" *Feingold*, 366 F.3d at 150 (quoting *Alfano*, 294 F.3d at 374).

Here, Yassari's aforementioned comments relating to Sandler's Jewish identity are

neither objectively severe nor pervasive enough to create a hostile environment, even if they

evidence some disapproval or even bias in the termination decision.  "For racist comments, slurs,

and jokes to constitute a hostile work environment, there must be more than a few isolated

incidents of racial enmity. . . . meaning that instead of sporadic racial slurs, there must be a

steady barrage of opprobrious racial comments[.]"  *Hill v. Frontier Tel. of Rochester, Inc.*, No.

15 Civ. 6212, 2018 WL 1256220, at *5 (W.D.N.Y. Mar. 12, 2018) (quoting *Schwapp v. Town of

Avon*, 118 F.3d 106, 110 (2d Cir. 1997)) (alterations in original).  Courts have found race-based

harassment that was both more severe and more frequent to be insufficient as a matter of law to

create a hostile environment.  *See Pagan v. N.Y. State Div. of Parole*, No. 98 Civ.5840, 2003 WL

22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (holding that use of phrase "fat Puerto Rican" twice

"does not amount to the sort of 'extremely serious' behavior required to give rise to a hostile

work environment"); *see also Hill*, 2018 WL 1256220, at *5–6  (collecting cases, and holding

that employees' use of phrase "nigger-rig" twice, "nigger please" once, and calling Black

plaintiff a "janitor," "pimp," and "drug dealer" did not constitute hostile environment).[6]

---

[6]     Sandler also attempts to argue that Yassari twice referenced the Holocaust to
Sandler and exhibited a view of "Holocaust denial."  The Court concludes, as a matter of law,
that Yassari's mere references to the Holocaust did not evince discriminatory animus, much less
an endorsement of the "fear," "hatred, "and "intimidation" associated with the Nazi regime.
(Dkt. No. 83 at 8.)  In cases like these, context is of paramount importance.  According to
Sandler, when he asked Yassari about why another doctor was not disciplined more harshly,
Yassari responded: "[L]et me give you an example you can understand.  In Austria, the

Sandler attempts to supplement his hostile environment claim by pointing to Yassari's facially neutral harsh treatment. Even after the Court takes account of Yassari's occasionally abusive language—e.g., "you fucking suck," and "I can't wait to get rid of you" (Dkt. No. 77-170 at 2)—Yassari's conduct over the course of several years does not rise to the level of severity or pervasiveness required to constitute a hostile environment. *See Douglass v. Rochester City Sch. Dist.*, 873 F. Supp. 2d 507, 509 (W.D.N.Y. 2012) ("[T]he sporadic verbal altercations and social snubs plaintiff describes do not indicate conduct so continuous, threatening, or offensive as to comprise a hostile work environment."), *aff'd*, 522 F. App'x 5 (2d Cir. 2013); *Davis-Molinia v. Port Auth. of New York & New Jersey*, No. 08 Civ 7584, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (holding allegations that defendants excluded plaintiff from meetings, questioned her overtime hours, yelled and talked down to her, diminished her responsibilities, excluded her from lunch gatherings, and did not intervene when co-workers refused to give her needed documents, and that one employee made a racist remark, were insufficient to demonstrate hostile work environment), *aff'd*, 488 F. App'x 530 (2d Cir. 2012); *Faison v. Leonard St., LLC*, No. 08 Civ. 2192, 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) (dismissing a hostile work environment claim because "allegations of persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim").

"The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or . . . even to behave reasonably and justly when he is peeved." *Davis-Molinia*, 2011 WL 4000997, at *11 (quoting *Christoforou v. Ryder Truck Rental, Inc.*, 668

---

punishment for denying the Holocaust is life imprisonment. But that's too dracon[ian], so no one enforces it that way." (SUF ¶ 338.) Perhaps Yassari's example is insensitive, but it cannot fairly be said to endorse Holocaust denial. Similarly, even if Yassari "needless[ly] reference[d]" the Holocaust to Sandler during surgery (SUF ¶ 339), such a reference alone cannot be said to indicate religious animus.

F. Supp. 294, 303 (S.D.N.Y. 1987)). Yassari's conduct, even if occasionally insulting or even demeaning, "was not physically threatening, was not particularly severe, and did not alter the conditions of plaintiff's employment, create an abusive working environment, or unreasonably interfere with plaintiff's work performance."[7] *Petrisch v. HSBC Bank USA, Inc.*, No. 07 Civ. 3303, 2013 WL 1316712, at *16 (E.D.N.Y. Mar. 28, 2013).

The Court next addresses whether Sandler's hostile environment claim survives under the more lenient NYCHRL standard. Under this standard, "a plaintiff must show that he or she was treated less well 'because of' a protected status." *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 626 (E.D.N.Y. 2017). The NYCHRL also recognizes "an affirmative defense, whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and inconveniences." *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 Civ. 10355, 2009 WL 873206, at *29 (S.D.N.Y. Mar. 31, 2009) (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (App. Div. 1st Dep't 2009)). "As with most affirmative defenses, the employer has the burden of proving the conduct's triviality under the NYCHRL." *Mihalik*, 715 F.3d at 111. "[I]n weighing both 'the plaintiff's claim and the defendant's affirmative defense, courts must consider the 'totality of the circumstances[.]'" *Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 446 (S.D.N.Y. 2014) (quoting *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (App. Div. 1st Dep't 2012)).

---

[7] The Court acknowledges that Sandler subjectively experienced an interference with his work performance, insofar as he alleges that Yassari's humiliating treatment made it hard for him to function. (Dkt. No. 83 at 10.) Even if that is true, it is not sufficient: the Court concludes that Yassari's conduct did not reach the objective level of severity required in hostile environment cases. "Indeed, far more egregious cases than this have been found not to create a hostile work environment." *Wells-Williams*, 2007 WL 1011545, at *5 (collecting cases).

By recognizing that a factual dispute exists as to whether Sandler was terminated on the basis of his Orthodox Judaism, the Court has already determined that a jury could conclude he was treated "less well" on account of that identity. *See Forrester*, 278 F. Supp. 3d at 633. Therefore, the question is whether Yassari's treatment of Sandler—in addition to his contribution to Sandler's termination—exceeded "petty slights and trivial inconveniences." *Id.* at 627 (quoting *Williams*, 872 N.Y.S.2d at 41). Defendants have not met their burden to prove that Yassari's conduct did not exceed this low threshold: the Court cannot conclude, as a matter of law, that a reasonable resident should expect to be told "you fucking suck" and be thrown out of the operating room. Because a genuine factual dispute exists as to whether Sandler's adverse treatment was based on his religion, summary judgment is denied on Sandler's NYCHRL hostile work environment claim. *Cf. Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 452 (E.D.N.Y. 2013) (granting summary judgment where defendant-doctor cursed at and verbally attacked Plaintiff because there was *no nexus* to protected characteristic).

### B.    Retaliation Claims

Sandler claims that Defendants retaliated against him in violation of federal, state, and municipal law. (Dkt. No. 1 at 30–32.) His federal and state retaliation claims are analyzed under the *McDonnell Douglas* framework:[8]

> First, the plaintiff must establish a *prima facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." . . .
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." If so, "the presumption of retaliation dissipates and the employee must

---

[8]    Section 1981 claims, NYSHRL claims, and Title VII claims for retaliation are all analyzed under the same framework. *See Augustine v. Cornell Univ.*, No. 14 Civ. 7807, 2015 WL 3740077, at *4 (S.D.N.Y. June 15, 2015).

show that retaliation was a substantial reason for the adverse employment action."

*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal citations omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

At step 1, Sandler bases his claim on three potential adverse employment actions: (1) his termination; (2) denial of the potential rehabilitation medicine rotation; and (3) defendants' OPMC report. (Dkt. No. 83 at 21, 22, 25.) The Court addresses each action in turn.

### 1. Termination

First, Defendants contend that summary judgment is warranted because (1) they were not aware that Sandler had engaged in any protected activity prior to his termination, and (2) Sandler cannot establish a causal connection between his complaint (once Defendants were aware of it) and his termination. (Dkt. No. 70 at 22–24.) The Court agrees.

Sandler maintains that he complained to Yassari directly about anti-Semitism in PGY-5. (Dkt. No. 83 at 21.) As a matter of law, this complaint is too attenuated from his termination in PGY-7 to establish causation. *See O'Hazo v. Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 261–62 (D. Conn. 2009) ("[I]n the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship." (quoting *Wilks v. Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 196 (D. Conn. 2007))). Next, Sandler points to his November 11, 2016 complaints to Flamm. (Dkt. No. 83 at 21–22.) These complaints, however, were insufficient to put a reasonable person on notice that Plaintiff was alleging discrimination—*i.e.*, engaging in "protected activity." *See* Dkt. No. 60 ¶ 69 ("Dr. Sandler repeated several times the [*sic*] he felt he was being 'abused' and 'harassed' by Dr. Yassari, but did not provide any specifics . . . . Nor did Dr. Sandler express any complaint that he was being subjected to unlawful discriminatory

treatment on the basis of his race, religion or any other legally protected characteristic.")  The

fact that Flamm apparently referred to Sandler's complaints about Yassari's abuse as "21st

century words" is irrelevant to whether Flamm was on notice that Sandler was complaining

about *discrimination* rather than merely rude or demeaning conduct.  *See Risco v. McHugh*, 868

F. Supp. 2d 75, 112 (S.D.N.Y. 2012) ("[I]mplicit in the requirement that the employer have been

aware of the protected activity is the requirement that it understood, or could reasonably have

understood, that plaintiff's opposition was directed at conduct prohibited by [antidiscrimination

laws].").

Finally, Sandler points to MMC's labor and employment counsel Robyn Ruderman's

investigation of his discrimination allegations after he met with Skae.  (Dkt. No. 83 at 21.)  But

Sandler does not dispute that Skae did not communicate his allegations to anyone else at MMC

until December 1, 2015, after the committee had already voted not to graduate Sandler from the

program.  (Dkt. No. 68 ¶¶ 61, 73.)  He has not pointed to any evidence that Ruderman, or anyone

involved in the November 16 graduation decision (*see* SUF ¶ 213), was aware of his October 30

complaint to Skae when that decision was made.  Therefore, although the complaint to Skae

technically constitutes general corporate knowledge to establish defendants' *awareness* of the

protected activity, the decision-makers' lack of notice essentially eviscerates the *causation*

element of the claim that the November 16 decision was retaliatory.  *See D'Agostino v. LA*

*Fitness Int'l, LLC*, 901 F. Supp. 2d 413, 426 (E.D.N.Y. 2012); *see also Zann Kwan*, 737 F.3d at

844 n.4 ("[The plaintiff] cannot satisfy the causation prong through mere corporate

knowledge.").

To survive summary judgment on causation, Sandler needs to "demonstrat[e]

weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered

legitimate, nonretaliatory reasons for its action," such that "a reasonable juror could conclude that the explanations were a pretext." *Id.* at 846. He has failed to adduce such evidence: by October 9, 2015, Flamm had informed Sandler that his surgical skills were unsatisfactory for a chief resident. (SUF ¶¶ 162–63.) Even though at that time Flamm and Yassari had "no plan to terminate Plaintiff's residency" (SUF ¶ 181), Sandler experienced two more surgical mishaps on November 4. The facts do not demonstrate inconsistencies or contradictions; to the contrary, they demonstrate continuously mounting concerns with Sandler's performance during PGY-7, which culminated in the November 16, 2015 decision of the committee that Sandler should not graduate.

Finally, it is undisputed that Flamm, Yassari, and Abbott were aware of Sandler's allegations of discrimination in December 2015. (Dkt. No. 68 ¶ 73.) But by that point, the adverse graduation decision was already made, and Sandler's termination was already in motion. There is no evidence to suggest that, but for his complaint, Sandler would have graduated; nor is there a causal connection between Sandler's complaint and his termination, the ultimate result of the November 2016 decision. *Cf. Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). This is especially true given that even after the relevant actors were told of Sandler's complaint in December, he was not formally terminated until several months later in March. *See Anglisano v. N.Y. City Dep't of Educ.*, No. 14 Civ. 3677, 2015 WL 5821786, at *8–9 (E.D.N.Y. Sept. 30, 2015) (explaining that,

while there is no bright line rule, three months has previously been found to be too long to find causation based on mere temporal proximity between protected activity and adverse action).[9]

Defendants are entitled to summary judgment on the question whether Sandler's failure to graduate and ultimate termination were retaliatory.

### 2. Denial of Rehabilitation Medicine Rotation

Sandler claims that MMC retaliated against him by conditioning his participation in a rotation in rehabilitation medicine on a waiver of his discrimination claims. Defendants challenge several elements of Sandler's *prima facie* case.

First, Defendants contend that Sandler did not suffer an "adverse employment action" when Ozuah conditioned his rehabilitation rotation on a waiver of his claims against MMC. According to Defendants, no adverse employment action occurred "because Plaintiff was not otherwise entitled to a rehabilitation medicine rotation as a term and condition of his residency." (Dkt. No. 70 at 26.) The Court rejects this argument: if Plaintiff was denied an employment benefit *for a discriminatory reason*, then antidiscrimination laws were violated even if he was not otherwise entitled to that benefit. As the Second Circuit has explained:

> Refusing to award a contract or a material employment benefit for a discriminatory reason violates [antidiscrimination] statutes.
> Indeed, were we to accept the defendants' interpretation, then failure to promote claims—or any claims alleging the denial of an employment benefit—would be non-actionable. And that cannot be the case. "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply

---

[9]    Moreover, as with Sandler's discrimination claim, Defendants have proffered a legitimate, non-retaliatory reason for his termination: his purportedly deficient skills. Therefore, even if Sandler had met his *prima facie* burden, he would need to provide evidence that this proffered reason is pretextual. At the pretext step, "[t]emporal proximity alone is insufficient to defeat summary judgment," *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 36 (E.D.N.Y. 2015), and Sandler has not definitively pointed to any other evidence of causation. (*See* Dkt. No. 83 at 22.)

not          to          provide          the          benefit          at          all."

*Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984)).

Next, Defendants argue that Ozuah's unawareness of Sandler's complaints precludes a finding of causation. Skae undisputedly had notice of Sandler's complaints starting in October 2015, and she testified that Sandler's rehabilitation rotation was subject to her approval. (Dkt. No. 77-27 at 229:19–23.) Skae further testified that she withheld that approval, and the contract governing Sandler's rehabilitation rotation was not finalized, in part because "the attorneys were involved"; she clarified that "one of the reasons" that the "finalizing of logistics" of the contract had to involve lawyers (and ultimately, the contract was not approved) was that Sandler had retained counsel for his discrimination claims. (Dkt. No. 77-27 at 230:18–24, 237:9–19.) From this testimony, in addition to the close temporal link between Sandler's complaints (October 2015), his retention of counsel (December 2015) (Dkt. No. 77-27 at 236:4–19), and the conditional rotation offer (January 2016), a reasonable factfinder could conclude that Sandler's complaints of discrimination were a but-for cause of MMC's waiver requirement for the rehabilitation rotation.

Defendants respond by proffering a legitimate non-retaliatory reason: "it was MMC's standard practice to secure a release," regardless of any protected activity by Plaintiff. (Dkt. No. 70 at 27.) Therefore, the question becomes whether this proffered reason is pretextual.

Based on the evidence, a genuine factual dispute exists as to pretext. Dr. Ozuah's testimony is MMC's only evidence of a general policy of conditioning a "compassionate or generous" offer to a failing resident on a waiver of claims against MMC. (SUF ¶ 244.) Defendants do not point to any other examples of such waivers or evidence of a written policy.

Ruderman testified that she learned that Sandler would be required to waive his claims for the first time in January 2016. (Dkt. No. 77-20 at 228:20–229:12.) Moreover, as explained above, Sandler has adduced evidence from which a reasonable jury could conclude that the waiver would not have been required had he not retained counsel regarding his discrimination claims.

Summary judgment is denied on the question whether the conditional rehabilitation offer was retaliatory.[10]

### 3. Referral to OPMC

Sandler next claims that Defendants retaliated against him by referring him to OPMC for allegedly falsifying his case logs.

Defendants argue that this claim is procedurally barred because it is "based on allegations which are not included in his Complaint." (Dkt. No. 70 at 28.) In response, Sandler argues that the Complaint alleges a "continuing pattern of retaliation." (Dkt. No. 83 at 26–27.) Sandler cites no case law to support the proposition that courts may consider allegations beyond the scope of the complaint in a retaliation case or to suggest that amendment is not required for retaliation claims based on post-litigation conduct. To the contrary, when some alleged retaliatory actions are omitted from the complaint, courts generally decline to consider those allegations. *See Cunningham v. N.Y. State Dep't of Labor*, No. 05 Civ. 1127, 2010 WL 1781465, at *7 (N.D.N.Y. Apr. 30, 2010), *aff'd*, 429 F. App'x 17 (2d Cir. 2011); *see also Puckett v. Nw. Airlines, Inc.*, 131 F. Supp. 2d 379, 382 n.2 (E.D.N.Y. 2001) ("Since this new allegation is beyond the scope of [plaintiff's] complaint, the court will not consider the argument."). Sandler's claim based on the OPMC referral is therefore dismissed.

---

[10] Because Sandler's underlying discrimination and retaliation claims survive summary judgment, so do his claims for aiding and abetting. (*See* Dkt. No. 70 at 34.)

### C.    Contractual Claims

#### 1.    Breach of Contract Claims

Sandler claims that MMC breached the House Officer Agreement, under which it agreed: (1) "To provide a suitable environment for the medical educational experience"; and (2) "To provide a training program which meets the standards of the essentials of an accredited Internship/Residency/Fellowship of the ACGME or other applicable accrediting organization[.]" (Dkt. No. 68-1 at 2.)  Defendants argue that the breach of contract claim fails as a matter of law because "the Program was at all times during Plaintiff's residency accredited by the ACGME." (Dkt. No. 70 at 29.)

First, Defendants' argument that continuous accreditation amounts to conclusive evidence that MMC's program satisfied "the *standards of the essentials* of an accredited [program]" is inconsistent with the plain text of the contract.  *See, e.g.*, *Sigal v. Metro. Life Ins. Co.*, No. 16 Civ. 3397, 2018 WL 1229845, at *6 (S.D.N.Y. Mar. 5, 2018) ("When interpreting a contract, courts must give 'the words and phrases used by the parties . . . their plain meaning.'" (quoting *Brooke Grp. Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (1996)).  "In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).  When construing contract terms, courts must "safeguard against adopting an interpretation that would render any individual provision superfluous." *Id.* at 1095.

Here, Defendants' interpretation, under which mere accreditation is all that is required, violates this canon against superfluities by ignoring the phrase "standards of the essentials" of accreditation.  If all that were required was continuous accreditation, then the contract would state that MMC agrees to "provide a program accredited by ACGME."  Instead, because the

contract contains the term "standards of the essentials," its plain text contemplates a situation in which a formally accredited program nonetheless fails to meet the standards of the most essential characteristics of an accredited program. The "essentials" of the accreditation standards is certainly a *narrower* category than the entire list of ACGME standards: "essentials" refers to only those standards that are most fundamental. Nonetheless, it would be unreasonable to adopt MMC's interpretation of this provision under which continuous accreditation constitutes conclusive evidence that the program satisfied the essentials of the standards. To meet its obligations under the contract, it may be *necessary* for MMC to maintain accreditation, but that does not mean that continuous accreditation alone is sufficient, as a matter of law, to demonstrate compliance with all of the essentials of the standards.

Second, Defendants argue that ACGME's 2016 investigation, which resulted in dismissal of Sandler's ACGME complaint without further action, represents conclusive evidence that MMC's program met the "standards of the essentials" of accredited program throughout Sandler's tenure. (Dkt. No. 70 at 30–31.) This may be true if—as MMC argues—ACGME's investigation was a "backward-looking" evaluation of "the Program as it existed *during Plaintiff's tenure*." (Dkt. No. 90 at 13–14 (emphasis added).) The Court concludes, however, that a genuine factual disputes remains as to whether ACGME's investigative findings evidence contemporaneous compliance in 2016 only, rather than retrospective compliance during the entirety of Sandler's tenure. As Sandler points out, ACGME's February 2017 report states: "On review of the findings related to the complaint *at the time of the site visit*, the Committee determined that the program has adequately addressed all complaint allegations." (Dkt. No. 68-18 at 4 (emphasis added).) Based on this evidence, a reasonable factfinder could conclude that ACGME's investigation was not intended to conclusively determine retrospective

compliance with the essentials of ACGME's standards for the entirety of Sandler's tenure, but rather assessed compliance contemporaneously (i.e., "at the time of the site visit").

The remaining question is whether Sandler has adduced evidence from which a reasonable factfinder could conclude that MMC breached its obligation to meet the "standards of the essentials" of ACGME during his tenure. Sandler points to the following evidence in support of his breach claim: (1) ACGME placed MMC's neurosurgery residency program on probation from January 18, 2013, to January 24, 2014, based on the program's failure to substantially comply with the ACGME's requirements for Graduate Medical Education; and (2) MMC's program was subject to 21 ACGME citations during Sandler's PGY-3 year. (SUF ¶ 31; Dkt. No. 77-45). These citations included, *inter alia*, a failure to: (1) "provide residents with adequate experience to learn operative management" of various neurosurgery procedures; (2) provide each resident with documented semiannual evaluation of performance with feedback; and (3) "provide an educational and work environment in which residents may raise and resolve issues without fear of intimidation or retaliation." (Dkt. No. 77-45 at 3–5, 7, 9.)

Defendants argue that "receipt of a citation is not itself sufficient evidence" of a failure to meet the "essentials" of the ACGME's standards. (Dkt. No. 90 at 14–15.) The Court agrees that this contractual provision does not require an immaculate record, wholly free of citations or even free of probation; however, certain citations and/or probationary status *may* evidence a failure to provide the essentials of ACGME accreditation. Whether MMC's probationary status or any of its citations during Sandler's tenure evidence a failure to comply with the essentials of the ACGME is a question for the finder of fact. *See Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 686 (S.D.N.Y. 2011) (explaining that, under New York contract law, mixed

questions of law and fact, including whether a contract has been materially breached, are generally decided by the factfinder).

Based on Sandler's evidence, a reasonable jury could conclude that, during his residency, MMC breached its agreement to provide a program that met the essentials of the standards of the ACGME; therefore, summary judgment is inappropriate.

Finally, Sandler also claims MMC breached its additional contractual obligation to "provide a suitable environment for the medical educational experience." (Dkt. No. 83 at 34.) Sandler's evidence is sufficient to survive summary judgment on this claim as well. As explained above, a reasonable juror could conclude that Yassari discriminated against Sandler in violation of federal, state, and municipal law. A reasonable juror could also conclude that such discriminatory treatment violated MMC's obligation to provide a suitable educational environment. *Cf. Jamaleddin v. Oakland Physicians Med. Ctr., LLC*, No. 13 Civ. 12735, 2015 WL 143929, at *8 (E.D. Mich. Jan. 12, 2015) (denying summary judgment on breach of contract claim because hospital "would necessarily be in breach of the anti-discrimination provision of the Residency Agreement" if it "is found to have discriminated against [Plaintiff]").

### 2. Breach of Covenant of Good Faith and Fair Dealing

Under New York law, all contracts contain an implied covenant of good faith and fair dealing, which encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)). This implied covenant includes a "pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)).

Defendants argue that Sandler's claim for breach of the covenant of good faith and fair dealing must be dismissed as duplicative of his breach of contract claim.  (Dkt. No. 70 at 33–34.)

"As a general rule, a claim for breaching the implied covenant of good faith and fair dealing 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract.'"  *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 02667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (quoting *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F. Supp. 964, 989 (S.D.N.Y. 1995)).  As Sandler points out, there is an exception to this general rule: "The law in New York is that a party 'may assert causes of action in both breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue[.]'"  *Id.* (quoting *Courtien Commc'ns, Ltd. v. Aetna Life Ins. Co.*, 193 F. Supp. 2d 563, 571 (E.D.N.Y. 2002)).

Here, the exception applies because the alleged conduct underlying the implied covenant claim is not coextensive with the conduct underlying the breach of contract claim.  *Cf. Deer Park Enters., LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90 (App. Div. 2d Dep't 2008) (dismissing implied covenant claim as duplicative of the breach of contract causes of action because the conduct and resulting injury alleged in both causes of action was "identical").  Sandler alleges that "Montefiore breached its obligation of good faith and fair dealing toward plaintiff by, *inter alia*, [1] depriving plaintiff of adequate opportunities to learn and practice neurosurgical procedures, [2] failing to inform plaintiff in a timely manner of any deficiencies in his volume of surgical procedures, and [3] failing to notify plaintiff until his final year of residency that he was in any danger of not graduating."  (Compl. ¶ 153.)  MMC's alleged failure to timely notify Sandler of deficiencies in his performance may not have violated the express terms of his

contract, but it may nonetheless have had "the effect of destroying or injuring" his right "to receive the fruits of the contract.'" *Dalton*, 87 N.Y.2d at 389. With respect to these allegations—and the breach of contract claim generally—there is a dispute over the scope of contract; therefore, "Plaintiff is not conceptually precluded from presenting both equitable and contract theories to the fact finder." *Fantozzi*, 2008 WL 4866054, at *8.

## III.     Motion to Strike Expert Report

Defendants move to strike the report of Marsha A. Miller, Plaintiff's expert, and to preclude her from testifying at trial. (Dkt. No. 71.) Sandler relies on this report to support his claim that MMC breached the essentials of the ACGME standards during his tenure. (Dkt. No. 85 at 2.) More specifically, Miller opines that:

> 1. Dr. Yassari failed in his responsibilities as program director to monitor Dr. Sandler's operative experience and take timely, appropriate action to ensure that he had sufficient operative experience to complete the program as a competent neurosurgeon. (Dkt. No. 84-1 at 3–4.)
>
> 2. Dr. Yassari and Dr. Skae failed to enforce and follow the institution's policies and procedures for remediation, dismissal, and due process and grievance. When Dr. Sandler was relieved of clinical duties in November 2015, they did not provide him with an intent to dismiss letter, a written remediation plan, or instructions for due process and grievance. (Dkt. No. 84 -1 at 7–8.)
>
> 3. Dr. Sandler was another graduating resident who had the same issues for which the program had previously been cited. If Dr. Sandler remained, the program director would be over his approved resident complement. Since the program had previously been placed on probation (2013) for deficiencies in case log monitoring and operative experience, to ask for a temporary increase could jeopardize the program's accreditation. (Dkt. No 84-1 at 9.)
>
> 4. The program lacked a supportive culture of professionalism. (Dkt. No. 84-1 at 10.)

It is well settled that a court may rule on a motion to strike expert testimony at the summary judgment stage, and where, as here, the evidentiary record is well developed, the court

may do so without holding a hearing.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007).

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts engage in a two-step inquiry to decide whether to allow expert testimony.  First, courts consider whether the expert herself is sufficiently qualified to testify. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013).  Second, courts evaluate whether the testimony "has a sufficiently reliable foundation."  *Id* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).  The indicia of reliability include "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"  *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). These factors, however, are not exclusive or unyielding—the inquiry is a "flexible" one, *id.* at 266, and the exclusion of an expert is "the exception rather than the rule,"  *Vazquez v. City of N.Y.*, No. 10 Civ. 6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (quoting *Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)).  Further, this analysis does not necessarily require an expert witness to testify with exact precision or through the use of scientific methodology; the reliability inquiry often focuses on the experiential knowledge of the expert.  *Davis*, 937 F. Supp. 2d at 412.

A.     **Rule 702 and *Daubert***

First, the Court considers Defendants' challenges to Miller's qualifications.  Defendants contend that Miller's nearly 30-year career at ACGME does not provide a basis for her testimony.  According to Defendants, Miller, who has no medical background, is unqualified because she had no role in investigating residency programs nor any decision-making authority

regarding complaints; her role—in Defendants' view—was purely administrative. (Dkt. No. 73 at 5–6.)

The Court concludes that Miller's background and experiences as an ACGME employee qualify her as an expert on the application of the ACGME standards. Miller served in three roles at ACGME over almost three decades: (1) from 1986 to 1996, she served as an Accreditation Administrator; (2) from 1996 to 2007, she was Associate Executive Director for ACGME Activities and Board Liaison Complaint Officer; and (3) from 2007 to 2015, she was Associate Vice President, Office of Resident Services. (Dkt. No 84 ¶¶ 6–8; Dkt. No. 84-1 at 2.) Although Miller never exercised ultimate decision-making authority in resolving complaints, her work required proficiency and familiarity with the ACGME standards, even in her earliest position as Accreditation Administrator. For example, she was responsible for "taking the [resident's] allegations and matching them to [ACGME] requirements" and then drafting a letter to the program explaining which requirements may have been violated (Dkt. No. 72-1 at 31, 38–40); to analogize to the litigation context, Miller essentially decided whether a complainant's allegations failed to state a claim on which relief could be granted. During the period 1997 to 2007, Miller not only drafted these notification letters but also sent them to the residency program directors under her own signature. (Dkt. No. 72-1 at 41.) From 2007 to 2015, in her vice president role, Miller's responsibilities regarding evaluation of complaints was enhanced: she drafted complaint summaries and then made recommendations to the resident review committee (which had ultimate decision-making authority) as to the proper disposition of resident complaints. (Dkt. No. 72-1 at 71.) Based on these professional experiences evaluating complaints and applying the

ACME requirements to allegations, the Court concludes that Miller is sufficiently qualified to testify as an expert on the ACGME requirements.[11]

The Court next turns to the second step of the Rule 702 inquiry: whether Miller's testimony has a sufficiently reliable foundation. Defendants contend that Miller's report is "based on speculation and conjecture and therefore is unreliable." (Dkt. No. 73 at 10.)

First, Defendants argue that Miller's conclusion that MMC failed to provide Sandler with the required minimum numbers of surgical procedures is speculative and unsupported by the documentary record. Miller testified that Sandler met his required numbers except for two surgical categories and that she could not say whether those two shortfalls would preclude him from graduating in June 2016. (Dkt. No. 72-1 at 168:20–169:4.) More important, Miller also testified that according to the documentary evidence, Dr. Yassari did not actually fail to provide Sandler with the required minimum number of operations. (Dkt. No. 72-1 at 170:4–12.) Based on this testimony, Miller's conclusion that Yassari failed to provide sufficient operative opportunities is unreliable and must be stricken.

However, there is a reliable basis for Miller's conclusion that MMC failed to appropriately *monitor* Sandler's progress toward the minimum required procedures, even if he had sufficient opportunities to meet the requisite numbers by PGY-7. In support of this conclusion, Miller relied on the program's history of citations for failure to provide adequate operative experience and to monitor resident case logs. (Dkt. No. 72-2 at 5.) She also pointed to

---

[11]     Many of Defendants' objections to Miller's testimony, including that she does not hold an M.D. or Ph.D. degree (though she does have a master's degree) and that she has never testified as an expert before, go to the weight, rather than the admissibility, of her testimony. *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253, 2010 WL 2674584, at *5 (S.D.N.Y. July 6, 2010); *see also Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 459 (E.D.N.Y. 2017) (concluding proposed expert was qualified and that gaps in his experience and fact that he had not previously testified as an expert went to weight rather than admissibility).

the fact that Sandler was assigned to conduct research during PGY-6 instead of to a fellowship where he could obtain the requisite procedures, despite Yassari's awareness that Sandler's numbers were behind in certain adult and critical care procedures.  (Dkt. No. 72-2 at 6.)  In sum, Miller's conclusion that Yassari was not monitoring Sandler's case numbers is reliably based on the evidence and her experience.  *See Lidle*, 2010 WL 2674584, at *6 (holding that proposed testimony based on experience alone was sufficiently reliable).

Second, Defendants challenge the reliability of Miller's conclusion that Sandler was terminated to prevent the program from exceeding its "approved resident complement," which would have potentially jeopardized its accreditation.  (Dkt. No 84-1 at 9.)  Miller's report states that "[a]nother reason for [Plaintiff's] dismissal may have been that he would have been an extra resident in the program."  (Dkt. No. 84-1 at 16.)  Miller testified, however, that this conclusion as to Yassari's motivation for terminating Sandler was "pure speculation" and could not be definitively confirmed.  (Dkt. No. 72-1 at 199:13–15, 200:18–201:13.)  Because Miller's opinion on whether the numerical limits on MMC's approved complement of resident played a role in the decision to terminate Sandler was based on speculation and conjecture, that portion of her expert report is also stricken and testimony on that opinion is precluded.  *See, e.g.*, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural.").

Third, MMC challenges the reliability of Miller's conclusion that MMC failed to follow its policies and procedures for remediation and due process prior to Sandler's termination. According to MMC, Miller's determination is unsupported by the documentary evidence because: (1) it is undisputed that MMC was permitted to engage in an informal attempt to resolve or remediate Sandler's deficiencies; (2) MMC actually engaged in an informal remediation

attempt; and (3) during Miller's deposition testimony, she failed to identify anything specific MMC's policies that would require a written formal remediation plan.  (Dkt. No. 73 at 15–16.) Miller did testify, however, that based on her experience, a written formal remediation plan is implicitly required in order to permit a resident to respond to potential adverse action by the residency program or to request a pre-termination hearing.  (Dkt. No. 72-1 at 194:7–21.)  Miller also testified that her conclusion was based in part on MMC's failure to provide timely, formal notification of *dismissal*, in addition to a formal remediation plan.  (Dkt. No. 72-1 at 192:3–7.) The Court concludes that Miller's experience working with the ACGME standards provides a sufficiently reliable basis for her conclusions, and that Defendants' objections go to the weight that such testimony deserves; contrary to Defendants' arguments, Miller's testimony on these points will aid the jury in evaluating whether MMC complied with its due process and remediation procedures.

Fourth, MMC contends that Miller's opinion that the program "lacked a supportive culture of professionalism" impermissibly impinges on the jury's role in resolving factual disputes; in MMC's view, jurors can evaluate questions of professionalism based on their own experience without an expert's input.  (Dkt. No. 73 at 16–17.)  Sandler responds that Miller's testimony will aid jurors in determining what "professionalism" means in the specific context of medical training, even if they may have a general familiarity with concepts like professionalism, harassment, and intimidation in other fields.  (Dkt. No. 85 at 12.)  Generally, "expert testimony is not helpful if it simply addresses 'lay matters which the jury is capable of understanding and deciding without the expert's help.'"  *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).  At the same time, "it is settled in this Circuit that expert testimony is helpful even where the jury might

have general knowledge of the subject at issue, so long as such knowledge may be incomplete or inaccurate given the particular facts and circumstances relevant to the particular case for which expert testimony is offered." *Vazquez*, 2014 WL 4388497, at *13 (quoting *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 358 (S.D.N.Y. 2001)). Here, MMC argues that Yassari's "abusive language or conduct" was not unprofessional precisely because it occurred in the particular context and circumstances of the operating room. The Court concludes that Miller's testimony may help the jury to evaluate whether any of the allegedly harassing, intimidating, or abusive conduct breached ACGME's standards of professionalism.

### B. Relevance

MMC also lodges a global objection to the relevance of Miller's report. MMC argues that Miller's report is irrelevant because ACGME dismissed Sandler's complaint in January 2017 after conducting its own investigation and evaluation of MMC's program. (SUF ¶¶ 265, 267; Dkt. No. 73 at 8.) According to MMC, Miller's report addresses only Sandler's personal allegations without addressing whether MMC's program generally complied with ACGME's requirements. (Dkt. No. 73 at 10.)

First, the Court concludes that the outcome of the ACGME investigation does not render Miller's report irrelevant. As explained above, given that ACGME's February 2017 report addresses the state of the program "*at the time of the site visit*" (Dkt. No. 68-18 at 4 (emphasis added)), a reasonable factfinder could conclude that ACGME's findings did not cover the entirety of Plaintiff's tenure at MMC. Furthermore, it is undisputed that "[t]he ACGME does not adjudicate disputes between individual persons and residency . . . programs . . . regarding matters of . . . contract, credit, discrimination, promotion, or dismissal of . . . residents." (Dkt. No. 68-17 at 1.) Therefore, the AGCME's disposition of Sandler's complaint does not render Miller's

report irrelevant, to the extent it evaluates whether MMC breached its ACGME requirements in its treatment of Plaintiff.

Second, the Court concludes that Miller's report, which addresses whether MMC breached any ACGME requirements in its treatment of Sandler himself, is relevant to his breach of contract claims. As Sandler points out, Miller's report and testimony will help the jury to evaluate: (1) whether MMC breached any ACGME standards that apply to the experience of individual residents rather than the whole program (e.g., limits on individual residents' hours-per-week or requirements for individual resident performance evaluations); and (2) how any past citations (e.g., for failure to "provide residents with adequate experience to learn operative management" regarding certain procedures (Dkt. No. 77-45 at 3–5)) or past breaches of the ACGME requirements affected Sandler's individual educational experience and training. (Dkt. No. 85 at 7.)

In short, because Miller's report and testimony will help the jury to understand the evidence in this case, it satisfies the relevance test.

### C.    Rule 403

Finally, Defendants challenge Miller's report under Federal Rule of Evidence 403. (Dkt. No. 73 at 17– 18.) "Even if expert testimony is deemed admissible, . . . it is still subject to exclusion under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice to the moving party." *Katt*, 151 F. Supp. 2d at 353.

The Court rejects MMC's contention that the "ultimate issue in this case is whether defendants intentionally discriminated against Plaintiff" and that therefore "[w]hether or not MMC was in compliance with ACGME guidelines bears little relevance to this case." (Dkt. No. 73 at 17.) To the contrary, the question whether MMC complied with the ACGME requirements is central to Sandler's breach of contract claim. The probative value of Miller's report on this

point is significant.  *Cf. Tchatat v. City of N.Y.*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) (excluding

doctor's expert report under Rule 403 because its conclusions "offer[ed] little in the way of

probative evidence" and the evidence was cumulative).

As to the question of unfair prejudice, Defendants raise further questions about the

reliability of Miller's testimony, based on the facts that the report was developed for litigation

purposes and that Miller did not conduct any independent interviews in preparing the report.

(Dkt. No. 73 at 17–18.)  Such alleged "methodological flaws . . . generally raise questions of

weight rather than admissibility," and although "questions of weight, when sufficiently

accumulated, [may] become so serious as to require exclusion," the Court has already concluded

that Miller's report is reliable enough to be admissible.  *Malletier v. Dooney & Bourke, Inc.*, 525

F. Supp. 2d at 563; *see also United States v. Am. Exp. Co.*, No. 10 Civ. 4496, 2014 WL 2879811,

at *10 (E.D.N.Y. June 24, 2014) (concluding that methodological flaws, individually or in

conjunction, were insufficient to warrant exclusion).  And Miller's report indicates that she

reviewed all of the relevant documents and deposition testimony in reaching her conclusions.

(Dkt. No. 72-2 at 21–22.)  Similarly, the Court has already rejected Defendant's argument that

the ACGME investigation renders Miller's report inadmissible.

The Court concludes that MMC has not identified such serious methodological flaws to

justify the exclusion of the Miller report under either Rule 403 or Rule 702.[12]

---

[12] In their reply brief, Defendants initially argued that Sandler's opposition brief was untimely.  (Dkt. No. 92 at 2.)  In response, Sandler moved for an extension of its opposition deadline *nunc pro tunc*.  (Dkt. No. 93 at 1.)  Because Defendants assented to Sandler's motion for an extension (Dkt. No. 94), that motion is granted.

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Defendants' motion to strike Plaintiff's expert report is GRANTED IN PART and DENIED IN PART.

Within two weeks of the date of this order, the parties shall confer and file a joint letter with proposed trial dates within the next six months.

The Clerk of Court is directed to close the motions at Docket Numbers 57, 71, and 93.

SO ORDERED.

Dated:  September 27, 2018
          New York, New York

_____
                J. PAUL OETKEN
          United States District Judge